

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 27, 2024

**BY ECF**
The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     *United States v. Irina Dilkinska*, S17 17 Cr. 630 (ER)

Dear Judge Ramos:

The Government respectfully submits this letter in advance of the April 3, 2024, sentencing of defendant Irina Dilkinska ("Dilkinska" or the "defendant"). The Probation Department accurately calculates her Guidelines range as 120 months (the "Guidelines Range"), and just punishment for her conduct plainly requires a substantial period of imprisonment. The defendant has requested a sentence of time served. The Probation Department has requested a below-Guidelines sentence of 96 months, or 8 years. Considering all of the Section 3553(a) factors, the Government respectfully submits that a below-Guidelines sentence, but one that includes a substantial period of imprisonment, is appropriate.

## I.     The Offense Conduct

### A.   The OneCoin Scheme

Having presided over the trial against Mark Scott and having sentenced five defendants who also participated in various facets of the OneCoin scheme, the Court is intimately familiar with the OneCoin scheme. For this reason, the Government does not summarize the details of the scheme here, and instead relies on the description f0of the scheme as set forth in the Government's sentencing submission for Greenwood. See Dkt. No. 570. For ease of reference, the Government has included a brief summary of the OneCoin scheme below.

Co-defendants Greenwood and Ruja Ignatova ("Ruja") conceived of and orchestrated a multibillion-dollar fraud scheme by which they defrauded millions of individual OneCoin investors (the "OneCoin Fraud Scheme"). Greenwood and Ruja co-founded OneCoin Ltd. ("OneCoin") in 2014. OneCoin was based in Sofia, Bulgaria. OneCoin marketed and sold a fraudulent cryptocurrency by the same name. Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.

While Greenwood and Ruja marketed OneCoin as a legitimate cryptocurrency like Bitcoin and deliberately drew the comparison between the two cryptocurrencies through their representations to investors and their marketing materials, OneCoin had no actual value and was conceived of by Greenwood and Ruja as a fraud from day one. The misrepresentations made by Greenwood and others to OneCoin investors were legion, and the cryptocurrency was worthless. Among other things, OneCoin lied to its members about how its cryptocurrency was valued, claiming that the price of OneCoin was based on market supply and demand, when in fact OneCoin itself arbitrarily set the value of the coin without regard to market forces. The purported value of a OneCoin grew steadily from €0.50 to approximately €29.95 per coin, as of in or about January 2019. The purported price of OneCoins never decreased in value.

### B.   The Defendant's Role in the Scheme

Dilkinska was OneCoin's head of legal from at least in or about 2015 through 2018. In that role, Dilkinska helped to organize the laundering of hundreds of millions of dollars of OneCoin fraud proceeds through an international network of money launderers. Dilkinska was an integral member of Ruja's inner circle who was involved in the OneCoin scheme nearly from its inception. Evidence, including text messages and email communications, show that Dilkinska had close contact with other high-level participants in the OneCoin scheme—namely, Ruja, Greenwood, Scott, Ignatov, and Frank Schneider.

Dilkinska's role at OneCoin included creating and managing shell companies that were used to hold properties in Ruja's name, open bank accounts, and launder proceeds from the OneCoin Fraud Scheme. As a manager of the shell companies, Dilkinska's responsibilities included organizing the transfer of OneCoin Fraud Scheme proceeds from bank accounts held in the name of shell companies to other money launderers, including Scott and Armenta.

After Ruja's disappearance in or about October 2017, Dilkinska told Ignatov that OneCoin had made false representations to the public about an audit of OneCoin's blockchain that had purportedly taken place in 2015 or 2016. In particular, OneCoin had represented that an external auditor had conducted and authored the audit report; in reality, the auditor had stolen the payment they had received for the audit and had not authored the audit report that was posted on OneCoin's website.

Dilkinska informed Ignatov about a number of incidents in which individuals who were supposed to launder money on behalf of OneCoin, instead stole the money. For example, Dilkinska told Ignatov that Aamer Abdulaziz, who was one of the main money launderers for Ruja, stole at least 100 million Euros that were proceeds from the OneCoin Fraud Scheme. Due to the fact that the money was derived from unlawful activity, nobody from OneCoin reported to law enforcement that the money was stolen.

Dilkinska made numerous statements in text and email messages indicating that she understood her actions were illegal. For example, emails were recovered between Dilkinska and Scott in which they discussed the laundering of OneCoin Fraud Scheme funds on behalf of Ruja. For example, in one email on October 20, 2016, Scott sent Dilkinska an email titled "Amended Loan" in which he wrote that "[t]here was a Euro 5.0 Mio distribution made as per the boss a few weeks ago. We need to paper this deal for our administrator." In another email between Dilkinska

and Scott, they discussed banking issues arising from banks' and administrators' drawing a connection between Dilkinska and OneCoin.  Dilkinska and Ignatov exchanged text messages in which they discussed the U.S. government's investigation into OneCoin, including their speculation that Scott might be cooperating with U.S. authorities, and that seeking his assistance in returning OneCoin funds therefore could be problematic.  In one of those messages, Dilkinska wrote that, if Scott were an informant, Dilkinska "would be in . . . much deeper shit" (*i.e.*, she would have been arrested if Scott—with whom Dilkinska had committed crimes—were cooperating with law enforcement).

## II.     Procedural History and Other Sentences Imposed

The Presentence Investigation Report reflects that the defendant was arrested in Bulgaria on March 20, 2023, and was extradited to the U.S. that day.  Based on information the Government has obtained from foreign law enforcement, however, the Government understands that Dilkinska was arrested in Bulgaria on or about June 2021 and spent approximately 16 months detained in Bulgaria between that date and her extradition to the U.S. in March 2023.[1]  Dilkinska was remanded into federal custody upon her arrival in this District on or about March 21, 2023.  Accordingly, by the Government's calculation, Dilkinska will have been detained for over approximately 28 months as of the date of her sentencing.  The Government has communicated with the Bureau of Prison's Designation and Sentence Computation Center ("DSCC"), which has informed the Government that the defendant's time detained in Bulgaria will be credited against any sentence imposed.[2]

On November 9, 2023, Dilkinska waived indictment and pleaded guilty to a superseding information charging her with one count of conspiracy to commit wire fraud and one count of conspiracy to commit money laundering.

Dilkinska is the sixth defendant to be sentenced in the case:

- On October 19, 2021, David Pike was sentenced to a term of probation of two years.  Pike's Guidelines range was 6 to 12 months.

- On February 16, 2023, Gilbert Armenta was sentenced to a term of imprisonment of 60 months.  Armenta's Guidelines range was 1,200 months.  Armenta also entered into a cooperation agreement with the Government, but he committed additional crimes after entering into his cooperation agreement and the Government did not provide him with a Section 5K1.1 letter.

---

[1] The Government understands that Dilkinska was detained in Bulgaria from on or about June 11, 2021 until July 27, 2021, and then again from December 1, 2021 until March 20, 2023, at which time she was extradited to the U.S.

[2] To ensure that the DSCC properly credits that time, the Government respectfully requests that the PSR be amended to include the defendant's time incarcerated in Bulgaria.

- On September 12, 2023, Karl Sebastian Greenwood, a cofounder of the OneCoin scheme, was sentenced to a term of imprisonment of 240 months.  Greenwood's Guidelines range was 720 months.

- On January 25, 2024, Mark Scott was sentenced to a term of imprisonment of 120 months.  Scott's Guidelines range was 600 months.

- On March 7, 2024, Konstantin Ignatov was sentenced to a term of imprisonment of time served.  Ignatov's Guidelines range was 1,080 months.  Ignatov entered into a cooperation agreement with the Government, but he committed perjury during his testimony at the trial against Mark Scott (after entering into his cooperation agreement) and the Government did not provide him with a Section 5K1.1 letter.

Probation recommends a sentence of 96 months' imprisonment, and the defendant requests a sentence of time served.  The defendant is a citizen of Bulgaria who does not have status in the United States.

### III.    The Sentencing Guidelines Range

The Probation Department calculated the Guidelines range as follows: the base offense level is six; 30 levels are added because the loss amount is greater than $550,000,000; six levels are added because the offense resulted in substantial financial hardship to 25 or more victims; two levels are added because a substantial part of the fraudulent scheme was committed from outside the United States, or the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means; three levels are added because the defendant was a manager or supervisor; and three levels are subtracted because the defendant accepted responsibility.[3]  The total offense level is 44, which is reduced to the maximum possible offense level of 43.

The defendant's criminal history category is I.  A total offense level of 43 and a criminal history category of I results in a Guidelines range of life, but that range is then reduced to the statutory maximum of 120 months.

### IV.    The Appropriate Sentence

#### A.  Applicable Law

While advisory following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines remain "the starting point and the initial benchmark" for sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  That is because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Id.* at 46.  For that reason, "in the overwhelming majority of cases, a Guidelines

---

[3] Because the grouping analysis does not ultimately affect the offense level, this summary omits the grouping analysis, which is described in greater detail at paragraph 81 of the PSR.

sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In imposing a sentence, the Court must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant;

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B. The Court Should Impose a Below-Guidelines Sentence that Includes a Substantial Period of Imprisonment

The extensive scale of the OneCoin Fraud Scheme, and Dilkinska's critical role in that scheme, drive the Government's sentencing recommendation of a sentence that is below the Guidelines Range but that includes a substantial period of imprisonment.

As to the offense conduct, as the Court well knows, OneCoin was an egregious fraud that took billions of dollars from millions of victims worldwide. Dilkinska helped to organize the laundering of hundreds of millions of dollars in fraud proceeds through an international network of money launderers, and she was an integral member of Ruja's inner circle who was involved in the OneCoin scheme nearly from its inception. She also continued to work at OneCoin after Ruja's disappearance.

The Government agrees with the Probation Department's assessment of the mitigating and aggravating circumstances that are present. Dilkinska has no criminal history, and she has obligations to her family, who are located in Bulgaria. She does not appear to have profited personally, beyond salary, for her role in the OneCoin scheme. That said, Dilkinska abused her position as an attorney and violated her ethical obligations in assisting in laundering hundreds of millions of dollars. The OneCoin Scheme preyed on vulnerable victims throughout the world; victims who are unlikely to be made whole for the substantial financial hardships they suffered. And, as described above, Dilkinska's role in the scheme continued for years—even after Ruja's disappearance.

As to relative culpability compared to previously sentenced defendants, the Government views Dilkinska as far less culpable than Greenwood and substantially less culpable than Scott. The Government also views Armenta's conduct as more culpable than Dilkinska's, but, unlike Armenta, Dilkinska did not make any attempt to cooperate, let alone Armenta's extraordinary such efforts.

Simply put, a below-Guidelines sentence that includes a substantial term of imprisonment is sufficient, but not greater than necessary, to account for the offense conduct, afford adequate deterrence, and promote respect for the law and provide just punishment for the offense. Dilkinska's role in the scheme was serious and calls for such a term of imprisonment.

## V.     Restitution and Forfeiture

Due to the difficulties that would be associated with fashioning a restitution order in this case, the Government respectfully submits that the Court should not enter a restitution order against the defendant.

Title 18, United States Code, Section 3663A(c)(3) provides that restitution shall not be applied in certain types of cases such as the instant case (*i.e.*, a fraud case), if the Court determines that:

> (A) the number of identifiable victims is so large as to make restitution impracticable; or

> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

The Government submits that both factors are met here.  Between the fourth quarter of 2014 and the fourth quarter of 2016 alone, the scheme took in more than $4 billion from at least 3.5 million victims.  Further, the defendant and his co-conspirators targeted OneCoin investors throughout the world.  Calculating investor losses would require identifying each of these millions of investors and determining how much they each invested.  Although a small subset of investors have come forward and identified themselves to the Government, the vast majority have not. Moreover, obtaining this information would be even more difficult in this case given the passage of time and the absence of accurate contact information for most of the victims.

For these reasons, the Government respectfully submits that it would be, as a practical matter, impossible to fashion a restitution order in this case and, in any event, the need to do so does not outweigh the complication and prolongation of the sentencing process. Therefore, the Government respectfully requests that the Court decline to enter a restitution order, as the Court did in the sentencings of Armenta and Greenwood.

As to forfeiture, the defendant has agreed to forfeit a sum of money equal to $111,400,000, which represents the proceeds traceable to the commission of her offenses.  A preliminary forfeiture order was entered by the Court at the time of the plea.  Dkt. 598.

**VI.    Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a below-Guidelines sentence that includes a substantial term of imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:  /s/
Juliana Murray
Kevin Mead
Nicholas Folly
Assistant United States Attorneys
(212) 637-2314

cc:     All Counsel of Record (ECF)